**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

NEAL E. ELKIN,
      Appellant,

      v.

DEPARTMENT OF VETERANS
  AFFAIRS,
      Agency.

DOCKET NUMBER
SF-1221-20-0387-W-1

DATE: July 18, 2022

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Neal E. Elkin, Ann Arbor, Michigan, pro se.

Coleen L. Welch, Martinez, California, for the agency.

**BEFORE**

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member
Tristan L. Leavitt, Member

**FINAL ORDER**

¶1      The appellant has filed a petition for review of the initial decision, which denied his request for corrective action in this individual right of action (IRA) appeal. Generally, we grant petitions such as this one only in the following circumstances: the initial decision contains erroneous findings of material fact;

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

the initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case; the administrative judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115). After fully considering the filings in this appeal, we conclude that the petitioner has not established any basis under section 1201.115 for granting the petition for review. Therefore, we DENY the petition for review and AFFIRM the initial decision, which is now the Board's final decision. 5 C.F.R. § 1201.113(b).

## BACKGROUND

¶2      As further detailed throughout the record and initial decision, the appellant began working as a primary care physician for the agency's Ukiah Community Based Outpatient Clinic (CBOC) in March 2016. Initial Appeal File (IAF), Tab 62, Initial Decision (ID) at 2. He quickly and consistently found the workload unmanageable, and he regularly clashed with nursing staff and managers alike. ID at 3-10. In September 2016, just 6 months into his time with the agency, the appellant first expressed his intent to resign. ID at 10. Although he would later change his mind about resigning, repeatedly, he continued to have difficulties with his workload, and his relationships with other employees continued to deteriorate. ID at 10-22. In January 2018, the appellant chose to stop working at the clinic, and he went on extended leave until he resigned almost 2 years later. ID at 22-24.

¶3      In the instant appeal, the appellant alleged that he was subject to whistleblower reprisal. IAF, Tab 1. After developing the record and holding the requested hearing, the administrative judge denied the appellant's request for

corrective action. IAF, Tabs 49, 51, 53 (Hearing Recording, Days 1-3 (HR1-HR3)); ID at 1. She addressed the following sets of disclosures, activities,[2] and personnel actions:

Disclosure 1 – inaccurate blood pressure readings,
Disclosure 2 – lack of clinic supplies,
Disclosure 3 – prior lapses in patient care,
Disclosure 4 – inadequate or improper nursing support,
Disclosure 5 – violation of conduct rules by another physician,
Disclosure 6 – improper handling of a cancer patient's complaint,
Disclosure 7 – lapse in building security,
Disclosure 8 – improper appointment to an Administrative Investigative Board (AIB), and
Disclosure 9 – improper workload.

Activity 1 – contact with the Office of Accountability and Whistleblower Protection (OAWP),
Activity 2 – contact with the agency's Office of Inspector General (OIG), and
Activity 3 – contact with an agency AIB.

Personnel Action 1 – a November 2017 admonishment,
Personnel Action 2 – a hostile work environment,
Personnel Action 3 – a December 2017 letter changing work conditions, and
Personnel Action 4 – an involuntary resignation.

---

[2] The administrative judge explained that the appellant never provided a concise list of his alleged disclosures and activities. ID at 26. For that reason, they are described differently throughout the pleadings below and on review. For the sake of simplicity and clarity, we are ordering the sets of disclosures, activities, and personnel actions in the same way as the initial decision, while also numbering them and providing a more succinct description of each.

We separately note that there is significant overlap amongst the disclosures and activities the appellant identified. For example, the appellant engaged in extensive communications about his workload, which the administrative judge analyzed under both the protected disclosure and protected activity provisions of the whistleblower statute, depending on the recipient. ID at 43, 48. Further complicating matters, some of the appellant's communications involved multiple matters, such that the administrative judge at times considered a single communication under more than one category of disclosures. For example, the administrative judge found that one email contained a protected disclosure about a prior lapse in patient care but additional complaints in the email about the appellant's workload were not protected. ID at 35, 44 (discussing IAF, Tab 38 at 33-34).

ID at 26-30. Of these, the administrative judge found that the appellant met his burden of proving that at least a portion of Disclosures 3, 5, 7, and 8 were protected, as were Activities 1, 2, and 3, but he failed to do the same with his other disclosures. ID at 31-48. The administrative judge also found that the appellant met his burden of proving the existence and coverage of Personnel Actions 1 and 3 under the whistleblower statute but not Personnel Actions 2 and 4. ID at 48-66.

¶4 The administrative judge next found that the appellant proved that Disclosures 3, 5, 7, and 8 were a contributing factor in Personnel Actions 1 and 3, but he failed to do the same for Activity 1, 2, or 3. ID at 66-68. Finally, upon shifting the burden for only those matters that remained, the administrative judge found that the agency proved that it would have taken the same personnel actions in the absence of the appellant's protected disclosures. ID at 68-77.

¶5 The appellant has filed a petition for review that primarily presents arguments about the disclosures the administrative judge found not protected. Petition for Review (PFR) File, Tab 5. The agency has filed a response, and the appellant has replied. PFR File, Tabs 7, 12.[3]

¶6 After establishing jurisdiction in an IRA appeal, an appellant has the burden of proving by preponderant evidence that: (1) he made a protected disclosure described under 5 U.S.C. § 2302(b)(8) or engaged in protected activity described under 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D), and (2) the disclosure or

_____

[3] With his reply, the appellant attached hundreds of pages of unexplained evidence. PFR File, Tab 12 at 31-290. We have not considered this evidence because the appellant presented no basis for us to conclude that it is both new and material. *Russo v. Veterans Administration*, 3 M.S.P.R. 345, 349 (1980) (recognizing that the Board will not grant a petition for review based on new evidence absent a showing that it is of sufficient weight to warrant an outcome different from that of the initial decision); *Avansino v. U.S. Postal Service*, 3 M.S.P.R. 211, 213-14 (1980) (recognizing that, pursuant to 5 C.F.R. § 1201.115, the Board generally will not consider evidence submitted for the first time with a petition for review absent a showing that it was unavailable before the record was closed before the administrative judge despite the party's due diligence).

protected activity was a contributing factor in the agency's decision to take or fail to take a personnel action as defined by 5 U.S.C. § 2302(a). *Salerno v. Department of the Interior*, 123 M.S.P.R. 230, ¶ 5 (2016). If the appellant meets this burden, the agency is given an opportunity to prove, by clear and convincing evidence, that it would have taken the same personnel action in the absence of the protected disclosure or activity. *Id.*

The appellant failed to prove that Disclosures 1, 2, 4, 6, or 9 were protected under section 2302(b)(8).

¶7      The vast majority of the appellant's petition for review consists of arguments that the sets of disclosures we identified as Disclosures 1, 2, 4, 6, and 9 were protected, and the administrative judge erred by finding otherwise.[4] PFR File, Tab 5 at 5. To address those arguments, we first note the proper analytical framework for determining whether a disclosure is protected.

¶8      A protected disclosure is one that the appellant reasonably believed evidenced gross mismanagement, a gross waste of funds, an abuse of authority, a substantial and specific danger to public health or safety, or any violation of a law, rule, or regulation. 5 U.S.C. § 2302(b)(8)(A). The disclosure must have been specific and detailed, not a vague allegation of wrongdoing regarding broad or imprecise matters. *Rzucidlo v. Department of the Army*, 101 M.S.P.R. 616, ¶ 13 (2006). The proper test for determining whether an employee had a reasonable belief that his disclosures revealed misconduct prohibited under the whistleblower statute is the following: Could a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the

---

[4] As alluded to previously, the appellant's description and numbering of these disclosures is somewhat different than the description and numbering we will use in this decision. For example, that which we have described as Disclosure 2 – lack of clinic supplies, the appellant describes as a disclosure that the agency was running out of nebulizers for patients with difficulty breathing. PFR File, Tab 5 at 5. That which we have described as Disclosure 6 – improper handling of a cancer patient's complaint, the appellant describes as a disclosure of delayed care for the patient. *Id.*

employee reasonably conclude that the actions of the government evidence wrongdoing as defined by the whistleblower statute?  *Id.*, ¶ 14.

¶9        The types of protected disclosures most relevant to the appellant's arguments on review are those concerning an abuse of authority or a substantial and specific danger to public health or safety.  Regarding the former, the Board has explained that an abuse of authority is an arbitrary or capricious exercise of power by a federal official or employee that adversely affects the rights of any person or that results in personal gain or advantage to himself or to preferred, other persons.  *Linder v. Department of Justice*, 122 M.S.P.R. 14, ¶ 15 (2014).  Regarding the latter, the Board has explained that disclosures about a danger to the public must be both substantial and specific to be protected.  *Schoenig v. Department of Justice*, 120 M.S.P.R. 318, ¶ 10 (2013).  Factors to be considered in determining whether a disclosed danger is sufficiently substantial and specific to be protected include the likelihood of harm, when the alleged harm may occur, and the potential consequences of the harm.  *Id.*  Disclosure of an imminent event is protected, but disclosure of a speculative danger is not.  *Id.*  To illustrate with a relevant example, the Board once found that an employee's disclosures were protected where he reasonably believed he was disclosing systemic problems regarding inadequate patient care with specific examples of misdiagnoses and misdirection of patients.  *Parikh v. Department of Veterans Affairs*, 116 M.S.P.R. 197, ¶¶ 12, 15-23 (2011).  With that background in mind, we now turn to the sets of disclosures the appellant reasserts on review.

*Disclosure 1 – inaccurate blood pressure readings*

¶10        The appellant made disclosures about the accuracy of blood pressure readings to the individual who served as Administrative Director and Nursing Supervisor (CBOC Manager) on at least two occasions, in April and September 2016.  IAF, Tab 48 at 4.  According to the appellant, his concern began on his very first day working for the clinic and continued throughout the

time that followed because he sometimes found that a patient's blood pressure was recorded as "lower and closer to normal" than he found when checking a patient's blood pressure himself. *E.g.*, IAF, Tab 12 at 6-7, Tab 38 at 15-16. The administrative judge concluded that the appellant failed to meet his burden for this set of disclosures. ID at 31-32.

¶11    On review, the appellant argues that this set of disclosures was protected because it revealed a substantial and specific threat to public health and safety. PFR File, Tab 5 at 6-10. To do so, he asserts that at least some of the blood pressure inconsistencies he found were far more extreme and dangerous than should be expected. *Id.* He directs us to a document dated September 15, 2016, at 3:00 a.m. *Id.* at 6 (referencing IAF, Tab 38 at 112-14). This document states that the appellant had seen a patient and measured his blood pressure as 200, even though the patient's medical record listed his blood pressure as 118. IAF, Tab 38 at 112-14. However, the document reads like a diary entry, written when the appellant was unable to sleep due to the stress of his job. *Id.* It is not addressed to anyone, and it does not provide further information. *Id.* For example, the document does not identify the patient, the source of the lower blood pressure reading, any suspected wrongdoing, or any indication that the appellant disclosed this specific instance to someone with the agency. *Id.*

¶12    We found additional evidence from later that same day, where the appellant did email the CBOC Manager about how he wanted nurses to measure blood pressure, and he mentioned a "major error" from a couple of days earlier. IAF, Tab 38 at 119-23. However, the "major error" was not further described. When the CBOC Manager asked for the patient's name, the appellant did not provide that name; he simply stated that the patient was "doing fine and his BP is under control." *Id.* at 120. The appellant further stated that he does his own recheck of blood pressures, "so [he is] not concerned that [he will] miss anything at this point," but he did not know whether others did the same. *Id.* In a final pair of follow-up emails, the CBOC Manager once again asked for the patient's

name, but the appellant's response provided neither the patient's name nor the attending nurse's name. *Id.* at 119. The appellant indicated that he would rather discuss the matter in person. *Id.*

¶13     Here, it is not apparent that the appellant reasonably believed that he was disclosing anything other than changes in patients' blood pressure. Although the appellant's concerns about the clinic nursing staff's blood pressure measurements began on his very first day seeing patients, and his first disclosure about the same occurred just a couple weeks later, *id.* at 15, he did not identify any particular impropriety that caused the alleged differences in blood pressure readings, any particular nurse associated with the readings, or any particular suspicion he may have had about the issue. *E.g.*, ID at 31; IAF, Tab 12 at 6-7, Tab 38 at 15-16.

¶14     As the administrative judge recognized, several agency witnesses described how the measuring and recording of blood pressure was a routine task, for which staff followed the agency's standard operating procedures. ID at 31-32. These witnesses further testified that increases in blood pressure readings between an initial consult with a nurse and the eventual exam with the appellant would not be surprising under the circumstances because patients routinely had to wait a long time for the appellant. ID at 32.

¶15     The appellant's petition remains devoid of any substantive and persuasive explanation for why he would have believed that he was disclosing the kind of wrongdoing covered by section 2302(b)(8). PFR File, Tab 5 at 6-10. We recognize and appreciate the appellant's suggestion that one specific set of blood pressure readings that he alluded to, from 118 to 200, is both too big to be accurate and potentially life threatening. PFR File, Tab 5 at 6-10; IAF, Tab 38 at 112-14. But, the facts surrounding those alleged readings or any other "major errors" remain unexplained by the appellant. Although it is certainly within the realm of possibility that nursing staff was making dangerous errors regarding blood pressure readings, the record does not show that the appellant reasonably believed that to be the case.

*Disclosure 2 – lack of clinic supplies*

¶16 The administrative judge next considered a set of disclosures about the clinic's supplies, particularly its supply of nebulizers and peak flow meters. *E.g.*, ID at 33-34; IAF, Tab 48 at 4. On review, the appellant only presents arguments about the nebulizers. He reasserts that he made a protected disclosure by twice reporting to the CBOC Manager that the clinic had an inadequate inventory of nebulizers in May and October 2016. PFR File, Tab 5 at 11-15. According to the appellant, this set of disclosures is protected because it revealed a substantial and specific threat to public health and safety. *Id.*

¶17 As alluded to in the initial decision, the clinic did have to adjust its on-hand inventory of nebulizers, from two to five or more, to accommodate the appellant's treatment preferences. ID at 33; *e.g.*, IAF, Tab 38 at 140. However, documentary evidence and witness testimony indicated that the change was needed because the appellant's use of nebulizers was different than most; both before and after the appellant's time at the clinic, the clinic rarely dispensed nebulizers because all the other clinicians preferred inhalers. ID at 33. Noting this, the administrative judge concluded that the appellant failed to prove that he had a reasonable belief of any substantial and specific threat regarding the supply of nebulizers because the appellant could and did provide patients with an adequate alternative. *Id.*

¶18 On review, the appellant acknowledges that he oftentimes provided nebulizers as a "back-up" treatment for patients that typically use an inhaler. PFR File, Tab 5 at 11. However, he argues that nebulizers and inhalers may not be interchangeable for some patients with extenuating circumstances. *Id.* at 12-15.

¶19 We have considered the appellant's arguments but do not find them persuasive. Although the appellant spoke with the CBOC Manager at least twice about the clinic's supply of nebulizers to provide for in-home use, *e.g.*, IAF, Tab 48 at 4, the appellant has described only one patient that seems to have been

impacted by the clinic not maintaining a larger supply on hand, PFR File, Tab 5 at 12; IAF, Tab 38 at 23-24. But, that individual already had an inhaler; he used the clinic's nebulizer during his encounter with the appellant; and he received his own nebulizer for home use within 10 days, via mail. IAF, Tab 38 at 23-25, 137. The appellant has not presented any basis for us to conclude that this patient, or any other, was in any specific and substantial danger from the clinic's inventory management.

¶20    We acknowledge the appellant's argument that there may be times when an inhaler and nebulizer are not interchangeable for some patients. However, the appellant has done little more than present conclusory assertions that are not persuasive. The appellant has not directed us to anything in the record documenting the prevalence of such patients or the surrounding circumstances. Those details are particularly relevant since the record before us suggests that the clinic always had a nebulizer to use in the office, it typically had nebulizers to provide for in-home use, and other facilities or providers were "close by" and "available to help," if needed. *E.g.*, *id*. at 23, 139-40. For that reason, the appellant has not proven by preponderant evidence that he reasonably believed his disclosures about the agency's inventory of nebulizers revealed a substantial and specific threat to public health and safety or any other category of wrongdoing protected under section 2302(b)(8).

*Disclosure 4 – inadequate or improper nursing support*

¶21    In the initial decision, the administrative judge described and considered several instances of the appellant raising questions or concerns about nursing support, but she found none protected. ID at 36-39. On review, the appellant has narrowed his arguments about this set of disclosures by referring only to his

communications about the availability of nurses from 12:00-1:00 p.m. and after 4:30 p.m.[5]  PFR File, Tab 5 at 36-37.

¶22     In one associated email, the appellant claimed that five nurses were at lunch and the one that remained was with a patient, resulting in the appellant tending to a homeless patient in the waiting room, looking unwell, possibly because his diabetes was uncontrolled.  IAF, Tab 39 at 42-43.  A few days later, the appellant reiterated this concern when he needed and received lunchtime nursing support but was told not to expect lunchtime nursing services to always be available. *Id.* at 44.   In another email, the appellant reported that he was told nursing services may not always be available after 4:30 p.m. either, but he found that unacceptable because his patients were regularly scheduled to come in as late as 3:30 p.m. and the clinic accepted walk-ins until 4:00 p.m.  *Id.* at 275.

¶23     While addressing these disclosures, the administrative judge considered testimony from the CBOC Manager, where she described how patients should not ordinarily be in the clinic during the lunch hour or after 4:30p.m. but a nurse would be available if there was a critical need.  ID at 37-38.  She found this testimony credible.  *Id.*  The administrative judge further found that the record was filled with evidence of the appellant being behind schedule and therefore working outside the clinic's normal operating hours, but the appellant failed to prove that a reasonable person would believe that his complaints about the clinic's schedule not matching his own were protected.  ID at 38.

¶24     In his petition, the appellant argues that his disclosures about nurse scheduling were protected because they revealed a substantial and specific threat

---

[5] For additional communications about nursing support that were addressed below, but not reasserted on review, we note that the administrative judge relied, in part, on the testimony of the appellant and other witnesses.  ID at 38.  Among other things, she considered the appellant's testimony to be self-serving.  *Id.*  Although it was error to reject the appellant's testimony as self-serving, the administrative judge's credibility determination was otherwise, and on the whole, proper.  *See Doe v. U.S. Postal Service*, 95 M.S.P.R. 493, ¶ 10 (2004) (sustaining credibility findings under similar circumstances).

to public health and safety. PFR File, Tab 5 at 36-37. He further describes the lunchtime encounter alluded to above, where a diabetic individual was in the waiting room, not feeling well, and the only nurse in the office was occupied with another patient. *Id.* at 36. The appellant characterizes this as an unsafe situation because nurses were trained to use an "Accucheck" and treat hypoglycemia, if needed, but he was not; the appellant could only sit with the patient and offer him something to eat. *Id.*; IAF, Tab 39 at 43. The appellant also disputes the administrative judge's description of the clinic as "closed" during the lunch hour because patients were oftentimes still being seen at that time or they were arriving early for their 1:00 p.m. appointments. PFR File, Tab 5 at 37. Finally, the appellant reiterates his belief that nurses should have been scheduled past 4:30 p.m. because the clinic was required to accept walk-in patients as late as 4:00 p.m. and the receptionist could occasionally accept a patient even later than that. *Id.*

¶25    We have considered these arguments but find no reason to disturb the administrative judge's conclusion. As made evident throughout the record, the clinic was not an emergency room or hospital. It was a facility with designated hours of operation where the appellant and others provided primary care services. *E.g.*, IAF, Tab 11 at 6-7, 185-87, Tab 39 at 555-57. For emergency services, the clinic referred patients to the hospital. *E.g.*, IAF, Tab 38 at 112, Tab 39 at 147.

¶26    The agency's expectation was for the appellant to work from 8:00 a.m. to 4:30 p.m. each day, with a lunch hour in between. *E.g.*, IAF, Tab 11 at 185-87. The appellant oftentimes would work through lunch and stay after hours to try and keep up with a workload that he found unmanageable. *E.g.*, IAF, Tab 38 at 57-58, 110, Tab 39 at 196. But, we discern no basis for concluding that the absence of consistent nursing coverage outside the clinic's ordinary operating hours was a substantial and specific threat to public health and safety.

¶27    We recognize and appreciate the appellant's recounting of the one instance in which a patient apparently arrived to the clinic's waiting room during the lunch

hour looking unwell. But, by the appellant's own description, a physician, a nurse, and a receptionist were all occupying the clinic at that time, and another nurse arrived within minutes. IAF, Tab 39 at 42-43. Although it is apparent that the appellant was frustrated by this incident, in part because he did not know how to best treat the patient, himself, we are not persuaded that he reasonably believed that his disclosure was protected. The record before us suggests that the clinic was ordinarily staffed during the lunch hour and staff would stay after their tour ended, if needed, to accommodate any emergency. *E.g.*, IAF, Tab 11 at 194, 198, Tab 39 at 44, 72. It also suggests that the appellant, himself, had sought help from the nearby hospital for instances in which the clinic could not care for a patient with emergency needs. IAF, Tab 38 at 112. For these reasons, we determine that the appellant's disclosures about nurses' schedules at the clinic reflect a policy disagreement, but do not also reveal any type of disclosure covered under the whistleblower statute. *See generally Hessami v. Merit Systems Protection Board*, 979 F.3d 1362, 1371 (Fed. Cir. 2020) (recognizing that "policy decisions and disclosable misconduct under the [whistleblower statutes] are not mutually exclusive").

*Disclosure 6 – improper handling of a cancer patient's complaint*

¶28        The next set of disclosures the appellant reasserts on review concerned a staff encounter with one of the appellant's patients—an encounter the appellant did not witness. ID at 15-16, 39-41; *see, e.g.*, IAF, Tab 39 at 145-70, Tab 48 at 4-5. According to associated medical records, this patient had experienced pain and other symptoms for over a year, but the appellant had attributed this to a relatively minor ailment. IAF, Tab 60 at 13. However, when the patient's symptoms continued to worsen and he sought care elsewhere, clinicians uncovered extensive cancer. *Id.* The patient brought this news to the clinic, asking to speak with the appellant. IAF, Tab 61 at 8. Notes in the patient's chart describe the appellant as "not available" during this encounter and describe the

patient as "understandably upset and feel[ing] the care received [at the clinic] was not aggressive enough to identify his ailment sooner giving him a greater chance of survival." *Id.*

¶29     As recounted in the initial decision, multiple staff members provided testimony, further describing this patient encounter and the events that followed. ID at 15-16, 39-41. They indicated that the patient had come to confront the appellant, not seek medical care from the appellant. ID at 15. When staff indicated that the appellant was not available, the patient left the office abruptly, informing them that he no longer intended to receive his care there and would instead go to a different agency facility. *Id.* Staff took action to find out more about the patient's cancer diagnosis and to elevate the issue, in part, because they interpreted the encounter as both a malpractice complaint and potential threat of violence. *Id.* However, they did not immediately inform the appellant about the diagnosis or encounter. ID at 15-16.

¶30     When the appellant did learn about the patient encounter, several days later, he asked numerous individuals about what happened and then engaged in various communications over many weeks about his conclusions. *E.g.*, IAF, Tab 39 at 145-70, 219-20. Among other things, these communications alleged that staff had lied about the appellant's availability, they had deliberately kept him in the dark, they had tarnished his reputation, and they had prevented the patient from receiving prompt follow-up care. *Id.*

¶31     The administrative judge found that the appellant failed to prove that these communications contained any disclosure protected under section 2302(b)(8). ID at 40-41. Instead, she found that they contained conclusory and unreasonable assertions of maliciousness on the part of agency staff, both in terms of their reporting that the appellant was unavailable at the time of the patient encounter and in terms of their care for the patient. *Id.*

¶32     On review, the appellant has characterized his communications about this patient as containing four distinct and protected disclosures. First, the appellant

argues that he disclosed a substantial and specific danger to public health and safety by revealing that staff failed to address a patient's urgent need for medical care. PFR File, Tab 5 at 21-23. Second, the appellant argues that he disclosed a substantial and specific danger to public health and safety, a violation of agency rules, and an abuse of authority by revealing that staff deliberately withheld the patient's condition from him for several days. *Id.* at 23-25. Third, the appellant argues that he disclosed a violation of agency rules for handling urgent test results. *Id.* at 25-26. Fourth, the appellant argues that he disclosed a substantial and specific danger to public health and safety, as well as a violation of agency rules, by revealing that upper management failed to adequately investigate the matter. *Id.* at 26-27.

¶33 We have considered each of these arguments but do not find them persuasive. By all indications, the patient in question understood the gravity of his situation, and he visited the clinic to end his treating relationship there, not to seek out advice or care from the appellant. Clinicians elsewhere had just diagnosed him with cancer in his pancreas, lungs, liver, lymph nodes, and bladder. IAF, Tab 60 at 13, Tab 61 at 9. When he came to the clinic, he did so upset about his "chance of survival." IAF, Tab 61 at 8. Witnesses described the patient visit as one in which he was "firing" the clinic and expressing his intent to go to elsewhere for further care. *E.g.*, ID at 62; HR2 (testimony of Medical Director at 28:00). A subsequent treatment note from a different agency medical center shows that he did just that; the patient sought care elsewhere. IAF, Tab 60 at 13. While doing so, the patient seemed to fault the appellant for dismissing his symptoms over the prior year. *Id.* The patient further described himself as having "not done anything" in the week or so since his diagnosis, "due to the shock," as well as "his anger that [it] was not diagnosed sooner." *Id.*

¶34 Plus, by all indications, staff at the CBOC clinic had followed up regarding this patient, despite the patient indicating that he wanted nothing more to do with the clinic, albeit through channels that did not include the appellant. As the

appellant has himself acknowledged, staff elevated the issue to multiple people, including the clinic's Medical Director, within the 2 days that followed the patient's unexpected visit to the clinic. *E.g.*, IAF, Tab 39 at 157; PFR File, Tab 5 at 16. Staff also attempted to contact the patient by at least the fourth day after that visit, as documented in the patient's chart. IAF, Tab 61 at 8. In addition, although staff did not immediately seek out the appellant to notify him of the encounter or diagnosis in person, multiple witnesses testified that the appellant would have received a prompt alert with the patient's test results. *E.g.*, ID at 16; HR2 (testimony of Medical Director).

¶35 It is undisputed that the appellant conducted his own informal investigation about what happened before making his disclosures. *E.g.*, ID at 16; IAF, Tab 39 at 138, 144, 152. For that reason, he would have been aware of the circumstances described above. In what appears to be his first communication to management about the issue, the appellant explicitly recognized that the patient had already visited the agency's Palo Alto facility for follow up regarding his new cancer diagnosis. IAF, Tab 39 at 151.

¶36 We appreciate that the appellant would still have reason for concern about the patient's health, he may have disagreed with the patient's decision to seek care elsewhere, and he may have wanted an opportunity to speak with the patient sooner. But, we do not find that the appellant reasonably believed that his communications about this incident—communications that primarily accuse staff of lying about his availability and purposefully keeping him out of the loop, while accusing management of failing to adequately deal with the same—revealed a substantial and specific danger to public health and safety. We are also unpersuaded that the appellant reasonably believed he disclosed an abuse of authority or violation of any established rule.

¶37 In large part, the appellant's arguments on review seem to rely on the appellant's suspicions about the staff and colleagues that surrounded him at the clinic. For example, the appellant asserts that he was in the clinic, all day, on the

day of this patient encounter, as proof that staff maliciously lied about his availability. PFR File, Tab 5 at 16. But, it is apparent that the appellant's presence in the clinic does not equate to him being unoccupied and available to attend to a brief and unscheduled meeting with a patient. The appellant also suggests that, while there was testimony indicating that the patient was "outraged" and "fired" the clinic during the encounter, it may have been a manufactured excuse to cover up the agency's response. *Id.* at 18-20. But, the appellant has identified no substantive evidence or testimony to support his suspicion, and, as previously mentioned, there is ample evidence to the contrary, much of which he was aware of at the time of his disclosures. *E.g.*, IAF, Tab 60 at 13, Tab 61 at 8.

¶38    Once again, it was the appellant's burden of proving that he reasonably believed that he was disclosing the type of wrongdoing described in the whistleblower statute. In this instance, he has not done so.

*Disclosure 9 – improper workload*

¶39    The final set of disclosures the administrative judge found not protected under section 2302(b)(8) were ones about the appellant's work backlog, work schedule, or workload during the period he worked for the clinic, between March 2016 and January 2018. ID at 43-47. On review, the appellant describes this set of disclosures as one about "work overload," and he once again argues that it revealed a substantial and specific danger to public health and safety. PFR File, Tab 5 at 27-35.

¶40    It is undisputed that the appellant regularly found himself behind and working longer hours than his normal work schedule, despite the agency periodically adjusting his schedule or providing other assistance to give the appellant an opportunity to catch up. For example, by May 2016, just 2 months into his time working at the clinic, the appellant had developed a backlog of nearly 800 "view alerts" in the agency's system for communicating matters such

as lab results, prescription refill requests, notes to be signed, and schedule changes.[6] IAF, Tab 38 at 30, Tab 39 at 50; ID at 4. Consequently, the Director of Primary Care blocked off some of the appellant's time for clearing that backlog, while also offering to personally sit with the appellant to help him do so. IAF, Tab 38 at 31, 35.

¶41    Over the next couple of months, the Director of Primary Care periodically monitored and assisted the appellant with his view alerts, sometimes clearing them out herself and sometimes granting him days of administrative time to catch up in a separate location, where he would not be distracted by patients. *E.g.*, *id*. at 41, 48, 57, 83, 86, 104-05. The appellant saw zero to three patients per day, at times, to allow for this extensive administrative time, and his backlog shrank. *Id.* However, by July 2016, the Director of Primary Care warned the appellant that his failure to timely handle matters, such as view alerts, jeopardized patients, so she expected him to both catch up and then stay current on his workload, which should include a schedule of 10 patient appointments or walk-ins per day. *Id.* at 65, 89.

¶42    Despite the accommodations, warnings, and some progress, the appellant's backlog of view alerts began to climb again, reaching 1,500 by September 2016. *Id.* at 110-11, 124. The appellant indicated that he was seeing three to five patients a day around that time, but he considered that overloaded and suggested that it could result in harm to a patient. *Id.* at 124-25.

---

[6] It is apparent that the amount of time it took to review or complete a "view alert" varied, depending on the nature of the alert. We found one instance of the appellant estimating that it took him 2 minutes to clear each. IAF, Tab 38 at 39. Elsewhere, he described clearing as many as three per minute. IAF, Tab 39 at 49. We also found another instance of the Director of Primary Care reviewing his backlog of alerts and finding that many were "already done" but remained in his backlog because the appellant simply failed to clear them from his queue. IAF, Tab 38 at 31. To provide further context, the record contains extensive documentation showing how the appellant's backlog of unprocessed view alerts oftentimes grew by several hundred per week. IAF, Tab 11 at 17-61.

¶43        In December 2016, the Director of Primary Care met with the appellant to review the agency's expectations.  IAF, Tab 39 at 72.  Among other things, that included attending to 10 patient slots per day; notifying patients of test results within 7 days if they required action or 14 days if they required no action; and completing notes with 48 hours.  *Id.*  The Director of Primary Care warned that failure to meet these expectations may result in discipline.  *Id.*

¶44        By March 2017, the appellant had a backlog of patient notification letters to complete, as well as 2,000 view alerts to dispose of, and he insisted that the agency's expectations of him were unrealistic, despite having some days with no scheduled patients.  *Id.* at 48, 57, 61.  The Director of Primary Care responded with dismay that the appellant had once again gotten behind, despite repeated assistance and repeated explanations of the agency's expectations.  *Id.* at 58, 61, 64, 68, 71.  She denied the appellant's request for additional administrative time without seeing patients, as well as his request to see no new patients; she set concrete deadlines for prioritizing and catching up on his backlog; and she warned him that discipline could follow if he failed to do so.  *Id.*

¶45        Nonetheless, in May 2017, the agency provided the appellant with dedicated administrative time to address his backlog of view alerts that had grown to 2,200.  *Id.* at 109-14, 118, 120, 122, 124.  Then, in June 2017, the agency issued the appellant a counseling letter, describing how he had repeatedly failed to complete test result notifications.  IAF, Tab 11 at 137.  Two months later, in August 2017, the Director of Primary Care and others once again communicated back and forth with the appellant about getting caught up and warned that his backlog of alerts was a patient safety issue.  IAF, Tab 39 at 185-91.  This led to the agency sending the appellant a letter, informing the appellant that his backlog of alerts would be handled by other providers and he was expected to stay current on new alerts.  *Id*. at 198-99, 203.  This letter also implemented a more structured and set schedule of 10 patient slots each day, with designated administrative time built in after

each. *Id.* at 198-99. Of note, the agency described this schedule as consistent with national standards and guidelines. *Id.* at 198, 201.

¶46      In November 2017, the appellant asked for some additional days with no scheduled appointments so he could catch up on yet another backlog of administrative tasks, but the Chief of Primary Care rejected the request, indicating that he was expected to keep up to date without the cancellation of appointments. IAF, Tab 11 at 181. Days later, the agency began the process of admonishing the appellant for his delinquent view alerts. *Id.* at 173-80. The next month, December 2017, he had a backlog of 1,500 view alerts. IAF, Tab 39 at 346. At that time, the agency reduced his schedule of patients and had other clinicians intervene to dispose of his view alerts. *Id.* at 337, 355-57. At the end of the month, when the appellant decided to allow his medical privileges to expire, the agency gave him weeks of administrative time to complete outstanding patient notes and view alerts before his extended leave that preceded his resignation. *Id.* at 359-60.

¶47      To the extent that the appellant engaged in communications about his work backlog, work schedule, and workload, the administrative judge found that they were not protected disclosures. Among other things, she determined that many were not protected disclosures because they merely asked questions, sought assistance, or requested changes to his schedule. ID at 44 (referencing, *e.g.*, IAF, Tab 38 at 28, 33-35, 56-57, Tab 39 at 47, 75, 226, 306). She also found that many others concerned staffing, retention, the agency's standards for time spent with patients, or the "dysfunction" at the clinic, but they were too vague and conclusory to be protected. ID at 44-45 (referencing, *e.g.*, IAF, Tab 11 at 266, Tab 38 at 29, 52, Tab 39 at 28-32, 75-79, 87). Finally, the administrative judge recognized that, although agency officials were aware of the appellant's backlog and agreed that his backlog of work constituted a patient safety issue, the appellant's communications about the same were not to reveal wrongdoing that

implicated patient safety—they were to complain that he was unable or unwilling to meet the agency's expectations. ID at 45-47.

¶48    On review, the appellant has alluded to a significant number of documents in support of his assertion that his communications about being overloaded with work, particularly when it came to his view alerts, were protected because they concerned patient safety.  PFR File, Tab 5 at 27-35 (citing IAF, Tab 11 at 4, 7-131, 137, 181, Tab 38 at 28, 30, 33-34, 39-40, 111, 124-25, 150-52, Tab 39 at 28-29, 48-51, 60, 130, 185-99, 336-63).  Although we have reviewed each, we do not find that he met his burden of proving that any contained additional disclosures of the types of government wrongdoing covered under section 2302(b)(8).

¶49    Much of the evidence cited by the appellant consists of the agency's communications—rather than his own—about the appellant's inability to keep up with his workload and remedial actions the agency took to deal with the same. *E.g.*, IAF, Tab 11 at 4-131, 137, 181, Tab 38 at 28, 30, Tab 39 at 198-99, 338-45, 349-54, 359-60.  Some other evidence consists of agency policy statements about managing view alerts.  IAF, Tab 38 at 150-52, Tab 39 at 50-51.  More are notes the appellant wrote to himself, not someone else, describing his difficulties with the agency's expectations.  IAF, Tab 39 at 48-49.

¶50    Other evidence the appellant cited consists of the communications in which the appellant explained why he had difficulties with the agency's expectations, while insisting that he needed more time than the agency allotted.  *E.g.*, IAF, Tab 38 at 33-34, 39-40, 124-25, Tab 39 at 28-29.  To illustrate, in one email, from 6 months into his time with the clinic, the appellant accused the Director of Primary Care of being "out of touch with reality" and "pressuring [him] to do more than [he] can responsibly do," while surmising that this was a "tale of substandard care" necessitated by "some bean counter."  IAF, Tab 38 at 125.  In another, the appellant criticized staffing levels and indicated that he had to work extensive overtime.  IAF, Tab 39 at 28-29.  Another email from the

appellant indicates that, despite him previously informing the Director of Primary Care that he understood and could meet the agency's expectations, he had determined that those expectations were unrealistic. *Id.* at 60.

¶51    Many others consist of the appellant's communication with agency officials about wrapping up his backlog and practice before separating from the clinic. For example, some emails complain the agency was refusing his proposal to reduce the number of patients he saw each day and was instead requiring a "dangerous schedule," which would cause undue stress and overtime. *Id.* at 130-31, 355. Several others show the appellant and managers trying to coordinate the reduction or elimination of patient appointments for the appellant, as well as the reduction or elimination of his backlog of view alerts and other administrative tasks, before handing patients over to other providers. *Id.* at 185-97, 336-37, 346, 348, 356-58, 361-63. At times, those communications in his final days working for the clinic contain broad allegations of improprieties, such as the appellant's allegation that management had "a vested personal interest in the dysfunctional status quo." *Id.* at 347.

¶52    The appellant's arguments on review about this set of disclosures do provide one instance of him describing how one, particular patient was reportedly harmed by inadequate follow up from lab reports. PFR File, Tab 5 at 30 (citing IAF, Tab 38 at 111). However, that instance involved a prior physician, not the appellant or his own workload, and the administrative judge found that discrete matter to be a protected disclosure about a prior lapse in care. ID at 36 (citing IAF, Tab 38 at 111). That disclosure about a particular instance involving a different clinician is markedly different from the appellant's communications about his own backlog of view alerts or other aspects of his workload, which constantly ebbed and flowed as the agency repeatedly warned the appellant about keeping up and provided assistance with the same, either by giving the appellant additional administrative time or by having another provider intervene.

¶53    In sum, we have considered all the documents the appellant cited on review regarding this set of disclosures about his workload, as well as his arguments about the same. The appellant makes a persuasive case about how view alerts or other administrative tasks that are altogether left to languish, unattended, could eventually result in harm to a patient under the agency's care. *E.g.*, PFR File, Tab 5 at 27-29. However, the appellant has failed to prove that he reasonably believed that to be the situation he was disclosing. This is particularly so because the appellant knew that numerous agency officials consistently monitored his workload and intervened to prioritize, reduce, or altogether eliminate both his backlog of administrative tasks and his schedule of patients when necessary. Simply put, the communications identified on review regarding the appellant's workload demonstrate that he was consistently dissatisfied with the agency's expectations, and he oftentimes wished that the agency would intervene in different ways or at different times as he got behind in his workload, but they do not show that he reasonably believed that he was disclosing the types of wrongdoing covered under section 2302(b)(8) of the whistleblower statute.

The appellant failed to prove that Personnel Actions 2 and 4 were cognizable personnel actions under the whistleblower statute.

¶54    To recall, the appellant alleged that he was subject to four retaliatory personnel actions: (1) a November 2017 admonishment, (2) a hostile work environment, (3) a December 2017 letter that changed work conditions, and (4) an involuntary resignation. *Supra*, ¶ 3. The administrative judge found that the November 2017 admonishment (Personnel Action 1) was a cognizable personnel action, ID at 48-49, as was the agency's December 2017 letter changing his working conditions (Personnel Action 3), ID at 62-63. However, the administrative judge reached the opposite conclusion for the alleged hostile work environment (Personnel Action 2), ID at 49-62, and involuntary resignation (Personnel Action 4), ID at 63-66.

¶55    On review, the appellant asserts that if we disagree with the administrative judge regarding the existence of additional protected disclosures, we should revisit the administrative judge's findings with respect to his allegations of a hostile work environment and involuntary resignation.  PFR File, Tab 5 at 5. He goes on to present cursory arguments about both.  *Id.* at 46.

¶56    As detailed above, we are not persuaded by the appellant's arguments about additional protected disclosures.  Nevertheless, we have reviewed the administrative judge's findings about the alleged hostile work environment and involuntary resignation.  ID at 49-62, 63-66.

*Personnel Action 2 – a hostile work environment*

¶57    The whistleblower statute's definition of a personnel action includes, inter alia, a "significant change in duties, responsibilities, or working conditions," and the Board has recognized that this phrase must be interpreted broadly.  5 U.S.C. § 2302(a)(2)(A)(xii); *Savage v. Department of the Army*, 122 M.S.P.R. 612, ¶ 23 (2015).  During the period that followed the administrative judge's initial decision, we issued a decision that further clarified the matter, particularly as it relates to allegations of a hostile work environment.  *See Skarada v. Department of Veterans Affairs*, 2022 M.S.P.B. 17.

¶58    In *Skarada*, we explained that, although the term "hostile work environment" has a particular meaning in some other contexts, allegations of a hostile work environment may only establish a personnel action under the whistleblower statute if they meet the statutory criteria, i.e., a significant change in duties, responsibilities, or working conditions.  *Id.*, ¶ 16.  And, while the "significant change" personnel action should be interpreted broadly to include harassment and discrimination that could have a chilling effect on whistleblowing or otherwise undermine the merit system, only agency actions that, individually or collectively, have practical and significant effects on the overall nature and

quality of an employee's working conditions, duties, or responsibilities will be found to constitute a personnel action covered by section 2302(a)(2)(A)(xii). *Id.*

¶59   Although the administrative judge issued the initial decision before *Skarada* and, therefore, lacked the explanation contained within, we find no basis for disturbing her findings of fact about the alleged hostile work environment or her conclusion that the appellant failed to prove that he was subjected to an additional personnel action cognizable under the whistleblower statute.   In the initial decision, the administrative judge provided a lengthy recitation of the appellant's allegations pertaining to a hostile work environment along with the associated evidence.   ID at 28-29, 49-60.   For the most part, these allegations concerned conversations and disagreements he had with colleagues. *Id.*   The administrative judge determined that the appellant subjectively felt hostility and much of the clinic staff did not like working with the appellant, but this was simply the result of the appellant's unusual work methods and demands, as well as his own objectionable behavior—the appellant did not prove that the agency subjected him to a significant change in duties, responsibilities, or working conditions. ID at 60-62.

¶60   The appellant's petition for review contains no more than a cursory argument to the contrary.   PFR File, Tab 5 at 46.   He suggests that the CBOC clinic was no ordinary workplace, where occasional disagreements or mistakes are expected, and the 3-day hearing recording demonstrates why that is so. *Id.* The appellant also poses a question, wondering why one witness was not discussed within the administrative judge's analysis, though the appellant fails to provide further explanation of the associated testimony. *Id.*   Without more though, we will not pour over the voluminous, documentary evidence or hearing recordings in search of a reason to disturb the administrative judge's extensive and well-reasoned findings of fact on this point. *See Marques v. Department of Health & Human Services*, 22 M.S.P.R. 129, 132 (1984) (recognizing that an administrative judge's failure to mention all of the evidence of record does not

mean that she did not consider it in reaching her decision), *aff'd*, 776 F.2d 1062 (Fed. Cir. 1985); 5 C.F.R. § 1201.115(a) (providing that a petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error).

*Personnel Action 4 – an involuntary resignation*

¶61 Regarding the appellant's allegation that he was subjected to a retaliatory involuntary resignation, the administrative judge determined that the appellant did not prove the requisite involuntariness of his resignation. ID at 64-66; *see generally Jenkins v. Merit Systems Protection Board*, 911 F.3d 1370, 1375-77 (Fed. Cir. 2019) (discussing the presumption that a resignation or retirement is voluntary and an appellant's burden of proving otherwise). Among other things, she noted that the appellant took extensive leave for nearly 2 years before eventually resigning from the agency. ID at 22-24, 65. She further noted that, during that time, the appellant had virtually no contact with the CBOC clinic and most of the officials he had routinely clashed with retired or otherwise left the agency. *Id.* For these reasons and others, the administrative judge concluded that a reasonable person in the appellant's position would not have felt compelled to resign when the appellant did so. ID at 65-66.

¶62 Again, the appellant presents little more than a cursory argument about his alleged involuntary resignation. PFR File, Tab 5 at 46. Without any substantive explanation, the appellant asserts that hearing testimony showed that his working conditions were intolerable. *Id.* That assertion provides no basis for disturbing the administrative judge's findings to the contrary.

The agency proved that it would have taken Personnel Actions 1 and 3 in the absence of the appellant's protected disclosures.

¶63 Again, for those matters where the administrative judge found that the appellant met his burden of presenting a prima facie case of whistleblower

reprisal, she shifted the burden to the agency. Upon doing so, the administrative judge found that the agency proved by clear and convincing evidence that it would have taken the same personnel actions (Personnel Actions 1 and 3) in the absence of the appellant's protected disclosures (Disclosures 3, 5, 7, and 8).

¶64    In determining whether the agency has met its burden of proving that it would have taken the same personnel action in the absence of an appellant's protected disclosures or activities, the Board will consider the following factors: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers, but who are otherwise similarly situated. *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). The Board does not view these factors as discrete elements, each of which the agency must prove by clear and convincing evidence, but rather, the Board will weigh the factors together to determine whether the evidence is clear and convincing as a whole. *Phillips v. Department of Transportation*, 113 M.S.P.R. 73, ¶ 11 (2010). In addition, the Board is mindful that "[e]vidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion." *Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012).

¶65    On review, the appellant does not present any particularized arguments about Personnel Action 1, but he does regarding Personnel Action 3. PFR File, Tab 5 at 38-45. Our analysis of the agency's burden will be similarly focused.

¶66    Personnel Action 3 consisted of the changed working conditions described in an agency letter, dated December 26, 2017, from the Director of Primary Care to the appellant. IAF, Tab 39 at 359-60. Among other things, it described how the appellant had decided to let his privileges with the agency's healthcare system expire, which prevented him from caring for patients and could lead to his

removal if he did not also resign. *Id.* at 359. The letter went on to indicate that the agency would provide the appellant with several weeks to catch up on view alerts and other administrative tasks, but he would do so in a different wing of the clinic, away from the primary care section where he typically worked. *Id.* The agency also gave the appellant specific instructions about how to communicate with nursing staff for that period. *Id.*

¶67    Regarding the *Carr* factors described above, the administrative judge first found that the agency had strong evidence in support of its actions. ID at 72-74. Inter alia, she explained that the agency had ample reason to believe that the appellant was planning to resign, he had administrative tasks to wrap up before doing so, and he had a lengthy history of being distracted from those administrative tasks when attending to his regular duties in the clinic. *Id.* Second, the administrative judge found that none of the relevant officials had a strong motive to retaliate against the appellant. ID at 74-75. Third, she found that, although there were some individuals who were not whistleblowers but were somewhat similar to the appellant in terms of falling behind on administrative tasks, the facts of each were distinguishable and did not support a finding of retaliation in this appeal. ID at 75-76.

¶68    In his petition for review, the appellant argues that the agency would not have implemented Personnel Action 3 in the absence of his emails to agency officials in the preceding days about his backlog of view alerts or other administrative tasks once again increasing. PFR File, Tab 5 at 38-45. But, in doing so, the appellant seems to exclusively rely on his communications in Disclosure 9, which were not protected. *See supra*, ¶¶ 39-53. Such arguments are unavailing because the agency's burden was only to prove that it would have taken the same personnel action in the absence of his protected disclosures. *Supra*, ¶ 6. In other words, even if the agency did implement Personnel Action 3 because of the communications it had with the appellant about his backlog of

administrative tasks in the preceding days, that does not warrant corrective action under the whistleblower statute.

¶69    The appellant also asserts that Personnel Action 3 constituted discipline, for which he should have been entitled to due process, and it violated his freedom of speech.  PFR File, Tab 5 at 39, 44-45.  Alternatively, he seems to argue that, although it may have been appropriate to eliminate his patient care duties for a couple weeks, or reduce them for longer, eliminating them for a month was excessive.  *Id.* at 43-44.  These brief arguments do not, however, persuade us that the administrative judge erred regarding the limited issues before us in this appeal.

¶70    To conclude, the appellant presented extensive arguments and allegations of reprisal during the proceedings below.  The administrative judge found that he presented a prima facie case of reprisal regarding a limited subset of the alleged disclosures and personnel actions, but he was not entitled to corrective action.  On review, the appellant has further narrowed his arguments and allegations.  We considered each but find no reason find that he is entitled to corrective action.

## NOTICE OF APPEAL RIGHTS[7]

You may obtain review of this final decision.  5 U.S.C. § 7703(a)(1).  By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b).  Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their

---

[7] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions.  As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) <u>Judicial review in general</u>**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date of issuance</u> of this decision. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The

Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

(2) **Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after you receive this decision.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017).  If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** after your representative receives this decision.  If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after you receive this decision.  5 U.S.C. § 7702(b)(1).  If you have a representative in this case, and your representative receives this decision before you do, then you must file

with the EEOC no later than **30 calendar days** after your representative receives this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[8]  The court of appeals must receive your petition for

---

[8] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017.  The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction.

review within **60 days** of the <u>date of issuance</u> of this decision.  <u>5 U.S.C. § 7703</u>(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

---

The All Circuit Review Act is retroactive to November 26, 2017.  Pub. L. No. 115-195, 132 Stat. 1510.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.


FOR THE BOARD:                    /s/ for _____

                                   Jennifer Everling
                                   Acting Clerk of the Board
Washington, D.C.